(C. D. 1880)

MARCONI INSTRUMENTS, LTD. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 22, 1957)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Richard M. Kozinn* and
*Henry J. O'Neill*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Certain imported klystron tubes, so called, identified by the number K–302, were classified by the collector of customs in that portion of paragraph 353 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, which provides for "Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy," and duty was imposed thereon at the rate of 15 per centum ad valorem.

Although plaintiff's protest invokes certain alternative claims for lower rates of duty than that assessed by the collector, at the trial, plaintiff limited its protest to the claim that the articles in controversy are "parts of radio apparatus, instruments, or devices" and fall within the second provision of said paragraph 353, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, and, accordingly, dutiable at 12½ per centum ad valorem.

Paragraph 353, as modified by said general agreement, *supra*, provides:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\*       \*       \*       \*       \*       \*       \*

Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines), 15% ad val.

The second provision of paragraph 353, as modified by the Torquay protocol to said general agreement, *supra*, reads:

Electrical signaling, radio, welding, and ignition apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for (not including television apparatus, instruments, or devices), 12½% ad val.

While plaintiff concedes that the klystron tubes rectify, modify, control, or distribute electrical energy, it claims that they are, never-

theless, more specifically described as parts of radio apparatus, instruments, or devices. It is not disputed that said tubes are "other than laboratory."

At the trial, plaintiff called Richard John Bailey as a witness. He testified that he is the manager of the New York office of the Marconi Instruments, Ltd., his duties being to control the importation, sales, and technical service of the instruments manufactured by that company; that Marconi Instruments, Ltd., is an importer of radio apparatus, "mainly instruments of the klystron tubes which we are dealing with here, and certain other electrical instruments, mainly for the purposes of measurement in radio apparatus." He produced a sample representing the imported item, which was received in evidence as exhibit 1.

Bailey holds a diploma from the City and Guilds College of London, England, in radio engineering. His war service was concerned primarily with radar equipment not only as an instructor, but as the radar officer of a fleet aircraft carrier whose radar equipment used the early forms of klystron tubes. As an instructor, he taught the basic elements of radar—then a new science—and was responsible for training radio mechanics in the maintenance of radar equipment for the British Navy. He also had experience as a senior radar officer of the largest (at that time) British aircraft carrier, "Formidable." As a result of his early training in radio and his active experience in the British Navy, Bailey displayed a very familiar and intimate knowledge of the nature, construction, use, and operation of the K–302 klystron tube.

He stated that the main function of the tube is "for the production of very short wave-length radio waves," a radio wave being described by the witness as "an oscillating wave which has been caused to leave the equipment in which it was produced or generated. An electrical vibration is considered to become a radio wave when it has in fact left the equipment, generally by means of an antenna, and has radiated out-into space."

Bailey testified that not all electrical currents become radio waves and that there are two basic types of electrical current. One is the direct, emanating from a flashlight battery, which cannot become a radio wave. The second type of current is an oscillating one which may oscillate at low frequencies at a very low speed, "such as the current which is drawn from domestic electrical supply," oscillating at the low speed of 60 pulses per second.

He stated that "cycles" is the technical term generally used for oscillations or pulses; that domestic current changes 60 times per second, but cannot be used to radiate into space since "the lowest speeds of oscillation at which a current can be made to radiate into

space is about 15,000 cycles per second." Continuing upon this point, the witness testified:

* * * In practice, a much higher frequency is generally used, in most cases from about half a million cycles per second to, say, 30 million. Now, although that sounds very high as a speed of oscillation it is in fact quite low in radio terms. Those speeds of oscillation from half a million to 30 million cycles per second are the speeds which are used, generally speaking, for entertainment broadcasting, which, of course, is one application of radio. Now, as I said, much higher speeds of oscillation are possible, and in fact it's very desirable to use much higher speeds than that for certain other purposes for which radio waves are used. By that I mean purposes other than the broadcasting of sound and music. One of these purposes is radar. And it can be shown mathematically that most types of radar operate more efficiently if they use radio waves of much higher frequency than 30 million times per second. And the majority of radar equipment these days works at frequencies of the order of 3 to 10 thousand million cycles per second, a very, very high rate of oscillation.

Due to the technical nature of the device in controversy, it is deemed prudent to quote at some length the testimony of the witness Bailey, who was shown to be exceptionally well qualified on the subject, rather than attempt to translate it into narrative form.

When asked to describe the development of the klystron tube, Bailey gave the following testimony:

* * * Perhaps it would be better—if your Honor will permit—if I first covered roughly the purpose for which the klystron tube was developed. Now, we have seen that radio waves are used for broadcasting and entertainment at frequencies, in general, up to about 30 million cycles per second. Now, just before the war it was noticed that these higher radio wave-lengths were interfered with by the passage of an aircraft. And it became apparent that if an aircraft could upset the passage of these waves then maybe this upset could be used in detecting aircraft. And that was the basis of the development of the early radar aircraft detecting equipment.

*     *     *     *     *     *     *

That was discovered as early as 1935, your Honor, and by the time the World War started in 1939 in Europe practical aircraft detecting equipment was in being. But this equipment suffered from the disadvantage that the wave length of the radio waves was too long to give a sharp indication of the aircraft's presence. It was a great help, but it was apparent that if the radio waves used for this equipment could be made much shorter, then very much better definition and accuracy could be achieved in the radar equipment. But in those early days there was no practical method of generating these very, very short wave lengths in sufficient power to be of practical use. So Government development programs were put in hand to try and find means of generating this very short radio energy, short wave-length radio energy of sufficient power that it could be used in radar equipment. And two major devices were the outcome of that research, the cavity magnetron and the klystron. Now, the klystron, although it was developed primarily for radar equipment, now has a variety of other uses, all concerned with the sending and receiving of radio waves but not necessarily for entertainment or the detecting of aircraft. It has other uses as well. It can be used for the transmission and the reception of television pictures. It can be used in distance measuring equipment for geodetic surveys. It's used in the new science of radio

astronomy. And in fact it can be used wherever very short wave lengths of radio energy are needed.

In describing the function of the klystron tube, Bailey testified:

\* \* \* The primary function of the kylstron tube is to take direct current which could be supplied from a battery and to produce from that direct current the oscillating current which we have discussed which, when it leaves the equipment, becomes a radio wave. So, the klystron tube, *the main purpose of a klystron, is as a generator of radio waves.* It does have some secondary applications. It can be used to amplify radio waves in the same way that the regular radio tube can be used to amplify radio waves of larger frequency. But *its main purpose is the production of radio energy.* [Italics supplied.]

In explaining how the klystron tube is used in connection with radio communication equipment, Bailey gave the following testimony:

\* \* \* The klystron is a generator or producer on radio waves. And it has this particular application, that it generates radio waves of very short wave length, of very high frequency, and the klystron can therefore be used and is used for the point-to-point communication systems which we see springing up everywhere these days. They can be recognized generally as a steel tower with two or maybe four circular dishes mounted on the edge and the top. Those are generally for communicating between distant points. And the source of the radio waves which allow for this communication, this transmission of speech or music, or even television, the source of those radio waves is generally a klystron tube.

Bailey also pointed out that the klystron tube is used merely as a piece of apparatus to produce radio waves which can be used for communication, television, radar, or radio beacons. In those applications, the witness stated, the klystron tube has no other function than to produce, rectify, or amplify *radio waves.*

When asked if he knew of any radio instrument that does not modify, rectify, or control electrical energy, Bailey answered that he did not "Because any radio instrument or apparatus is concerned with radio, either in its measurement or in its production, and radio is the control of electrical energy. The production and control of electrical energy is essentially radio."

It is also interesting to note that in radio astronomy radio waves are utilized in detecting or receiving, as stated by the witness, "radio signals which reach the earth from outside the earth's atmosphere from the universe." Further, in this connection, the witness stated, "Very little is known as to the way in which these radio waves are generated, but it is well known that they exist. And radio astronomy is attempting to locate the sources of these waves. And it can also be used to some extent to determine the position of various heavenly bodies and planets."

Bailey stated that he knew of no instrument which employs a klystron tube that is not a radio instrument. He gave a detailed technical description of the manner in which a klystron tube changes a direct electrical current into a very high frequency oscillating current in gen-

erating radio waves which, he stated in conclusion, can be used "for whatever purpose is required, *either the sending of pictures, speech, music, or for radar equipment.*" [Emphasis added.]

While it is difficult to contemplate the speed of oscillation of a radio wave, the witness stated that "there is effectively a top limit which is of the order of 100,000 million cycles per second." The witness further stated that "a radio wave travels always at the same speed as light, namely 186,000 miles per second."

The defendant called as its witness Henry Huff, employed by the Sperry Gyroscope Co. Division of the Sperry Corp., in an effort to introduce what purported to be a license agreement between the Sperry Corp. and the English Electric Valve Co. for the production of klystron tubes. The paper was excluded from evidence, however, and it is unnecessary to refer further to the testimony of Huff.

The testimony of the witness Bailey stands, therefore, without contradiction. It is clear from the evidence given by him that whether the klystron tube be used in its application to radiobroadcasting of speech and music; in radar sets for the detection of ships, aircraft, or other objects; as apparatus employed for radio astronomy; in geodetic surveys; or in television sets for broadcasting sound and scenes in black and white or color, the principles of radio waves are applied.

For these reasons, we do not accept the contention of the defendant that the provision for radio apparatus and instruments and devices is limited to those items which are used exclusively in radiobroadcasting, but applies as well to a device, such as a klystron tube, which, as above indicated, whether used in radio, radar, or television, applies the same principles of radio-wave activity.

We have examined the various cases cited by defendant in its brief, but find them without compelling force here.

A provision for "radio * * * apparatus, instruments (other than laboratory), and devices" first appeared in the statutes in paragraph 353 of the Tariff Act of 1930. Since that time, there have been rapid strides forward in the field of electronics, and the industry has grown to such magnitude that there is today physical evidence of the inventive genius of Marconi in practically every American home. In 1935 and the years immediately following, students of electronics, by means of the klystron tube, succeeded in generating radio waves to develop what is described as radar for use in aircraft and other detecting equipment. And then came a further advance in the use of radio waves to create what is commonly referred to as television, which not only reproduces sound and action in black and white, but, more recently, in color.

The question naturally arises—What is radio? Our concept of the meaning of the term is aided by reference to lexicographic and other authoritative definitions which are set forth below.

Webster's New International Dictionary (1953), second edition, defines the word "radio" as follows:

**radio,** *n.* **a** The transmission and reception of signals by means of electric waves without a connecting wire; the use of radiotelegraphy or radiotelephony for conveying messages. **b** *Colloq.* A radio message; radiogram. **c** A radio receiving set.

**radio,** *adj.* **a** Of or pertaining to, employing, or operated by, radiant energy, specifically that of electric waves; hence, pertaining to, or employed in, radiotelegraphy or radiotelephony or other applications of radio waves. **b** Of or pertaining to electric currents or phenomena of frequencies between about 15,000 and $(10)^{11}$ per second. **c** Pertaining to or used in radio or a radio set; as, a *radio* dial, transformer; specializing in radio; as, a *radio* engineer.

Collier's Encyclopedia (1953), volume 16, page 538, contains the following statement:

**RADIO,** the method of transmitting messages or programs from one point to another without connecting wires, by propagation of electromagnetic waves. The term radio includes both wireless telegraphy and wireless telephony.

The Encyclopaedia Britannica (1947), volume 18, page 885, defines the word "radio" as follows:

**RADIO** is the combining form denoting relation to or connection with a ray, a radius, or radiation * * * In electricity its general application is in association with electric waves (*q. v.*). In its specific application to radio communication the word is used to denote the transmission and reception of signals by means of radiated electromagnetic waves. The signals translated may be the ordinary sounds sensed by the ear or they may be the "signals" of images sensed by the eye which have been translated into "sound" signals, as in television. Communication by radio in its various forms, including such phases as wired wireless, wireless telegraphy, wireless telephone, general types of broadcasting, television, is too broad a subject to be treated adequately in a single article.

At page 873, the same authority gives the following information:

**RADAR** is an electronic device which provides man with the ability to detect and locate objects of a certain sort at distances and under conditions of lighting or obscuration which would render the unaided eye quite useless. * * *

Also, in the Encyclopaedia Britannica, at page 873A, there appears the statement:

**How Radar Works.**—Radar is a coined word derived from the initial letters of the phrase "radio detection and ranging." *Radio waves* sent out from the powerful radar transmitter are reflected by objects in the vicinity. * * * [Italics supplied.]

The definition of the word "television" is given in Webster's as follows:

**television,** *n.* Vision at a distance; hence, the transmission and reproduction of a view or scene, esp. a view of persons or objects in motion, by any device which converts light rays into electrical waves and reconverts these into visible light rays.

Collier's Encyclopedia (1953), volume 18, page 464, also defines the word "television":

**TELEVISION,** the transmission and reception of visual images in motion by electrical means. Actually, it consists of converting the lights and shadows of a scene into corresponding electric signals which may be broadcast, or transmitted over radio relay and coaxial cable circuits. At the receiver these signals are reconverted into a visible image which recreates the original scene.

In the Encyclopedia Americana (1953), volume 10, page 207g, under the title "ELECTRONICS," the following appears:

The development of electronics has been stimulated to a large extent by the development of the *radio* [italics supplied] and its many ramifications. The rapid rise of air transportation has made necessary the perfection of communication devices and also the development of radio beams for guiding airplanes in bad weather. These have made severe demands upon the techniques of electronics and they have been met with a variety of new devices of which the *klystron* is an example. The klystron is a combined thermionic tube and oscillating circuit that is able to radiate very short electromagnetic waves such as permit the production of sharply defined beams.

The provision in paragraph 353 relied upon by the plaintiff would appear to be very broad in its scope. It is not limited to what are commonly regarded as radio sets. On the contrary, the paragraph enumerates radio apparatus, radio instruments, and radio devices. Said paragraph also provides that parts of the foregoing shall pay the same rate of duty as the articles of which they are parts.

It appears from the record that the klystron tube was developed primarily for use in radar equipment although it has other uses, all of which, however, involve the application of radio waves—for instance, in broadcasting speech and music, in the transmission and reception of television pictures, in distance-measuring equipment for geodetic surveys, and in radio astronomy. In each case, however, the klystron tube is used as a generator of radio waves or radio energy. As a matter of fact, the witness Bailey, who was exceptionally well qualified in the technology of radio apparatus, testified, in substance, that he did not know of any device that employs a klystron tube which is not a radio instrument.

Whether or not the klystron tube was primarily used in radar equipment, we see no reason why it should not fall within the class of articles of radio apparatus, instruments, or devices, or parts thereof, since radar is merely an adaptation of radio waves for the purpose of range-finding and the detection of objects.

In short, wherever the klystron tube is used, it is employed as a generator of radio waves.

As we have pointed out above in the definitions which have been quoted, Webster's dictionary speaks of radio as "Of or pertaining to, employing, or operated by, radiant energy, specifically that of electric waves; hence, pertaining to, or employed in, radiotelegraphy or radio-telephony or *other applications of radio waves*"; and, in the Encyclopaedia Britannica, "In its specific application to radio communication

the word [radio] is used to denote the transmission and reception of signals by means of radiated electromagnetic waves. The signals translated may be the ordinary sounds *sensed by the ear* or they may be the 'signals' of images *sensed by the eye* which have been translated into 'sound' signals, as in television.'' [Italics supplied.] See also Collier's Encyclopedia (1953), volume 16, page 538, subject ''Radio.''

The lexicographic definitions comport with our own impression that the provision for radio apparatus, instruments, and devices was used by Congress in its broader sense and, unless otherwise indicated, would include a device such as the K–302 klystron tube when used as a generator or producer of radio waves.

Plaintiff has invited our attention to the case of *United States* v. *Herman H. Sticht & Co.*, 22 C. C. P. A. (Customs) 40, T. D. 47048. It appears from an examination of the opinion of the court in that case that the merchandise before it consisted of certain indicators designed to be attached to the transmitter of a radiotelegraph apparatus to indicate to the operator the potential capacity of the transmitter, in terms of words per minute, at the speed at which the transmitter is being operated at a given instant. The court held that the article was properly classifiable in paragraph 353 of the Tariff Act of 1930 as a *part* of an electric telegraph apparatus or a *part* of a radio apparatus. This decision is in harmony with the conclusion we have reached in the present case.

As pointed out earlier in this opinion, the Torquay Protocol to the General Agreement on Tariffs and Trade modified paragraph 353 of the Tariff Act of 1930 in several respects. Pertinent here is the modification, which reads:

Electrical signaling, radio, welding, and ignition apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for (not including television apparatus, instruments, or devices), 12½% ad val.

Another provision in said paragraph relates to ''Articles having as an essential feature an electrical element or device,'' such as certain named exemplars, and enumerates ''Television apparatus, 12½% ad val.''

The exclusion of television apparatus, instruments, or devices from the provision for electrical signaling and radio apparatus, instruments, and devices conveys the implication that, had not television apparatus been excepted, it would have been embraced within the term ''Electrical signaling, radio, * * * apparatus, instruments * * *, and devices, * * *.'' However, as noted above, television apparatus has, by the said protocol, been placed in the class of articles having as an essential feature an electrical element, dutiable at the same rate as electrical signaling or radio apparatus.

In neither the statutes, trade agreements, nor protocols is any specific reference made to radar equipment. However, for reasons above indicated, there would seem to be sound reason for including it within the provision for electrical signaling radio apparatus, instruments, and devices. Note *United States* v. *United Geophysical Company*, 38 C. C. P. A. (Customs) 137, C. A. D. 451.

The witness Bailey testified that radar "developed as an evolution of radio * * *. In fact, we would claim that it is radio used for purposes other than the transmission of sound and speech." This we understand to mean, when read in the light of other testimony of the witness, that it is radio used for purposes in addition to its use for the transmission of sound and speech. It gained impetus as an instrument of practical value between 1935 and 1939. As stated by Bailey:

* * * Now, just before the war it was noticed that these higher radio wavelengths were interfered with by the passage of an aircraft. And it became apparent that if an aircraft could upset the passage of these waves then maybe this upset could be used in detecting aircraft. And that was the basis of the development of the early radar aircraft detecting equipment.

As a result of development programs fostered by Government agencies, means were devised for generating "short wave-length radio energy of sufficient power that it could be used in radar equipment."

Thus, it would seem that, by means of the klystron tube, radio waves have been increased, as stated by Bailey, to at least 100,000 million cycles per second, so that, while radio waves of a lesser force may be used for broadcasting music or speech, radio waves of greater intensity, as above pointed out, are used as aircraft detecting equipment and for various other purposes.

It seems clear from the foregoing that radar equipment is just another electrical signaling or radio apparatus or device.

Although the klystron tube may have other uses, for instance, in television, geodetic surveys, and radio astronomy, nevertheless, in all of these uses, the main purpose of the klystron tube is, as disclosed by this record, to generate radio waves.

As so appropriately stated in the Encyclopaedia Britannica (1947), volume 18, page 885—

So many new developments are occurring in radio that it is impossible for a survey to predict tendencies even a few years hence; * * *

It would extend this opinion unduly if we attempted an exhaustive treatment of this interesting subject.

Briefly reviewing the situation, we learn from reliable sources, aside from the expert testimony of the witness Bailey herein, that for a great many years the subject of radio or radiant energy has been a continuing source of interest to scientists.

Without tracing the entire history of the subject, we find that, as early as 1883, Fitzgerald (George Francis) "suggested a method of producing electro-magnetic waves in space by the discharge of a conductor." A few years later Hertz (Heinrich Rudolph) found that "electro-magnetic waves are in complete accordance with the waves of light and heat, and founded the theory upon which *all modern radio signalling devices are based.*" [Italics supplied.]

In 1896, the late Marchese Guglielmo Marconi placed his application for the first British patent for wireless telegraphy, and, after conducting various experiments in communicating signals over varying distances, on March 30, 1903, the first transoceanic radiogram was published in the London *Times.*

Experiments continued to be made, and, on July 28, 1915, the American Telephone and Telegraph Co., in conjunction with the Western Electric Co., went a step further and succeeded in establishing wireless telephone, communicating by wireless from Arlington, Va., to Hawaii. Wireless telephone experiments were continued, and, later that year, communication was effected by wireless from Arlington to the Eiffel Tower in Paris, France.

It is interesting to note that, in 1927 and 1928, radiotelegraphy was extended to the principal countries of the world, and that, during this same period, experiments at the Bell laboratories "effected successful transmission by *wire and radio of* television signals." [Italics supplied.] Encyclopaedia Britannica (1947), volume 18, pages 885 and 886.

It appears that the above authority acquired the data to which reference has been made from an official bulletin of the United States Department of Commerce.

The amazing application of radio waves, which made possible the means of communication by wireless telegraphy and wireless telephony, were soon adapted to the use of radio apparatuses and instruments in the home and certain public places where the spoken voice and music, vocal or instrumental, were made available for education, entertainment, and so forth.

Then, in 1935, according to Bailey, it was discovered that radio waves were being intercepted by aircraft, which fortunately led to the construction of the klystron tube for use in generating and amplifying the intensity of radio waves to the point where another ramification of radiant energy became an instrument of great value and utility in the last world war as a means of detecting friendly or unfriendly aircraft. Finally, a new adaptation of radio waves brought into the homes of today what is known as television.

In short, whether we have radiotelegraphy, radiotelephony, radio instruments for utilization of sound for entertainment or education,

radar "for radio detection and ranging," apparatus employed for radio astronomy or for geodetic surveys or television—in each instance, the actual means of transference of signals, sound, or image, from a transmitter at one point to a distant receiver are by radio waves.

Upon the record and for the foregoing reasons, we find and hold that the klystron tubes in controversy are parts of radio apparatus, instruments, or devices of the kind made dutiable in paragraph 353, as modified, *supra*, at 12½ per centum ad valorem. Since that provision is more specific than the provision for "Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy," the claim in the protest for classification as parts, above enumerated, is sustained.

Judgment will issue directing the collector of customs to reliquidate the entries accordingly.