**GEHRIG, HOBAN & CO., Inc., Plaintiff,**
v.
**UNITED STATES, Defendant.**
C.D. 3628;  Protest No. 65/11745–12957–63.

United States Customs Court,
Second Division.
Nov. 26, 1968.

Alan S. Hays, New York City (Brooks & Brooks, Cadwalader, Wickersham & Taft, John Boyer and Paul W. Mandry, New York City, of counsel) for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen., (Harold L. Grossman and Herbert P. Larsen, New York City, trial attorneys), for defendant.

Before RAO, Chief Judge, and FORD, Judge.

RAO, Chief Judge:

The merchandise involved in this case consists of "HYDRODIST" Master and Remote Electronic Distance Measuring instruments, Model MRB2. They were imported from South Africa and entered at the port of New York on February 14, 1962. Duty was assessed at 35 per centum ad valorem under paragraph 360 of the Tariff Act of 1930, as modified by the trade agreement with Switzerland, 90 Treas.Dec. 174, T.D. 53832, as surveying instruments and parts thereof, in chief value of metal. Various claims are made in the protest but those presently relied on are that the articles are dutiable at 12½ per centum ad valorem under paragraph 353 of said tariff act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, as radio apparatus, instruments, and devices, or at 15 per centum ad valorem under said

paragraph, as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802, as articles suitable for producing, rectifing, modifying, controlling or distributing electrical energy.

The pertinent provisions of said tariff act, as modified, are as follows:

Paragraph 360, as modified by T.D. 53832:

Surveying instruments and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for ........................... 35% ad val.

Paragraph 353, as modified by T.D. 52739:

Electrical signaling, radio, welding, and ignition apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for (not including television apparatus, instruments, or devices) .................................. 12½% ad val.

Paragraph 353, as modified by T.D. 51802:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\* \* \* \* \* \* \* \*

Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or sheer; flashlights; batteries; vacuum cleaners; and internal-combustion engines) ......................... 15% ad val.

---

Plaintiff called one witness at the trial and introduced three exhibits. Defendant called no witnesses but introduced one exhibit. It was stipulated that the Hydrodist Model MRB2 was wholly or in chief value of metal.

Plaintiff's witness was Andrew Stephen Morrison, an electronics engineer, who at the time of the trial was chief engineer at the Tellurometer Division of Plessey, Incorporated, at Farmingdale, N. Y. That division manufactures electronic equipment under contract to the United States Army and services and distributes electronic instruments which it manufactures and also those manufactured by the Plessey South Africa Company electronics division in Capetown, producer of the within merchandise. After graduation from high school Mr. Morrison had spent 1 year at Glasgow Wireless College, 3 years in the British Merchant Navy Service, and 2 years in the Royal Air Force. By part-time study, he received the final certificate in telecommunications engineering from

City and Guilds College in London. He later passed the graduateship examination of the Institution of Electronic and Radio Engineers in London. He took post-graduate courses in radar systems engineering, including navigational equipment, digital techniques, and computer technology, receiving a certificate from Chelmsford Technical College in Essex, England.

Between 1960 and 1964 he was employed by the Marconi Company of Chelmsford, doing work on circuit design and system design in radar and allied equipment. In 1964 he joined Plessey, starting work as a project engineer, carrying out systems work, designing circuits, and building models of electronic instruments. He came to the United States in March 1966 to help the company carry out environmental testing and begin production of these instruments. During the course of his work he became familiar with all the equipments that Plessey had produced, including the Aerodist system, the Microdistancer and the Hydrodist system.

Mr. Morrison testified that the Tellurometer series of instruments, including the Hydrodist, employ a system developed by Dr. Trevor Lloyd Wadley, for which he obtained a patent in South Africa in 1956 and one in the United States in 1959. A copy of the United States patent was received in evidence as plaintiff's exhibit 1. This system utilizes radio microwaves to transmit measuring information between a master and a remote station. (Patent, exhibit 1; Tellurometer Manual, exhibit A; brochures on Hydrodist MRB2, exhibits 2 and 3.) According to Mr. Morrison, it differs from other systems in that it employs secondary radar principles, along with phase measuring techniques of primary and secondary signals. He explained that primary radar uses a transmitter to transmit a pulse energy which travels to a target. The target then reflects part of that energy back to the transmitter, where a receiver is usually stationed. The pulse is amplified and compared with a reference, and a meas-

urement of the transit time of the radio waves can be made and converted into distance. The secondary radar system uses another transmitter-receiver at the target. This transmitter or remote instrument amplifies the signal and retransmits it. It is compared with the originally-transmitted phase information, thus providing a measurement of the transit time of the radio waves which can be translated into distance.

The Hydrodist Model MRB2 consists of master and remote units. Each unit has a dimension of 14 by 10½ by 7½ inches and weighs approximately 30 pounds, complete with its integral power pack. Both units include a tripod, a 12-volt battery and radio-telephone headgear. The batteries supply the electrical power needed to operate the instruments. Both use Klystron tubes to generate microwaves in radio frequency bands between 2.9 and 3.1 thousand megacycles. These microwaves are used to measure distance and to carry on voice communication between the master and remote operators. The Klystron tubes allow the modulation required. The units contain components which rectify, modify, control, and distribute electrical energy.

To operate the Hydrodist MRB2, the master and remote units are switched on and tuned to each other. The final adjustments are carried out by master and remote control operators discussing how the measurement will begin. For this purpose the radio-telephone headsets, consisting of earphones and microphones are plugged into the instruments. Some 15 minutes is required to prepare the instruments for their measurement function. The operators have to be in voice communication in order to determine exactly how the instruments shall be set up initially and how the measurement shall proceed.

There are various types of read-out or indicating units. In the Hydrodist system the primary signal is caused to generate time trace or circular time trace on the face of a cathode ray tube, and the return from the remote unit is represented as a bright-up on the trace.

In this way the transit time of radio waves can be read from calibrations from the circumference of the cathode ray tube.

The basic purpose of the equipment is to measure the distance between the master unit and the remote unit by the use of radio waves. In the process, the MRB2 can be set for three pattern frequencies. One allows a determination within 10,000–meter intervals; the second allows a determination within 1,000–meter intervals, and the third inside 100–meter intervals. Measurements are taken at as many as 10 different frequencies in order to resolve errors due to the propagation effects of microwaves, when they reflect from objects. The Hydrodist will operate to distances of 40 or 50 miles provided sufficient height is obtained, but there must be a clear line of sight between the units.

Two types of measurement can be made with the equipment. It is possible to make a fixed position determination to within one or two meters, or the progress of a moving vessel can be followed. The vessel, however, must be kept on a straight line.

According to Mr. Morrison, when the Hydrodist is operating in the radio-telephone function, it is operating as a two-way radio. When it is switched to the measure function, it is radio apparatus which is used in a secondary radar application. He explained that radar (radio aid for direction and ranging) is radio apparatus which is used for radio determination purposes in a manner which requires the comparison of a reference signal with a transmitted signal which can either be retransmitted by the position where the detection or measurement is required or reflected at that point.

The witness testified that the basic purpose of the MRB2 is to measure distances and that other applications are considered secondary. The vocal communications are used in order to set up the instrument for operating and measuring. He said that there are a number of uses to which the Hydrodist can be put. One of those is in hydrographic surveys. When an aircraft is used, the equipment measures slope distance. If a number of measurements are made using more than one remote instrument, it is possible to measure height or fix a position.

The MRB2 is a device used in surveys for precision measurement of distance on the earth's surface by means of a microwave system which measures travel time of an electrical signal. The MRB2 before the court consists of a master station which transmits an electrical signal to a remote station, where it is received and immediately rebroadcasted back to the master set. The measurement of the travel time results in a reasonably precise measurement of distance, to one or two meters. It is designed for and used in surveys for measuring distances. Its measuring is done electronically. It is not normally used to measure distances on land but is designed especially for installation aboard small vessels.

Plaintiff claims that the Hydrodist incorporates a radio-telephone communication system which precludes its classification as a surveying instrument under paragraph 360, supra; that it is covered by the provision in paragraph 353, supra, for radio apparatus, instruments and devices, or by the provision for articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy. Defendant's position is that the Hydrodist is a surveying instrument and is properly classified as such under paragraph 360, supra.

■ Both parties have called our attention to definitions of surveying, some of which were quoted with approval in R. W. Smith v. United States, 41 Cust. Ct. 78, C.D. 2024. We note for example:

Webster's New International Dictionary, 1927 edition: *survey, v.t.*; surveyed; surveying. * * *

* * * * * *

4. To determine and delineate the form, extent, position, etc., of, as a tract of land, a coast, harbor, or the like, by taking linear and angular

measurements, and by applying the principles of geometry and trigonometry.

*survey,* n. * * *

* * * * * *

3. The operation of finding and delineating the contour, dimensions, position, etc., as of any part of the earth's surface, whether land or water; as a land or hydrographic *survey;* * *.
*surveying* * * * Specif.: *n.* Act or occupation of making surveys; * * *.

The Encyclopedia Americana, volume 26, page 91:

SURVEYING, the science of determining the positions of points on the earth's surface for the purpose of making therefrom a graphic representation of the area. By the term earth's surface is meant all of the earth that can be explored—the bottoms of seas and rivers, and the interior of mines, as well as the more accessible portions. It includes the measurement of distances and angles and the determination of elevations. * * *

Both parties are in agreement that surveying is not limited to land measurement alone. See also Davies, Turner & Co. et al. v. United States, 40 Treas. Dec. 177, T.D. 38877, where it was held that sextants, used almost exclusively for navigational purposes to determine the position of a vessel at sea, were dutiable as surveying instruments. In the course of the opinion the court said (p. 180):

It would seem, in the light we now have before us, that these instruments are as much surveying instruments upon the water as others may be surveying instruments upon the land. We are not governed by the name under which the instrument may pass, or the technical terms given to its use; but it is a fact that there is a branch of surveying known as hydrographic surveying in which sextants are used. It is not possible upon the water to run a line as it is upon the land, but it is possible to obtain a similar result by the measurement of angles with a sextant. Sextants are used to determine the true position of a vessel as in navigation, or in marine surveying the position and distances of objects on the shore, or of islands or rocks, and in so doing the instrument is as much a surveying instrument as those that are used upon the land.

The New International Encyclopedia, volume 21, page 703, divides surveying instruments into the following broad categories: (1) for measuring distances, (2) for determining directions, (3) for determining horizontal lines, (4) for measuring angles, and (5) for miscellaneous work. The Encyclopedia Americana, volume 26, page 92, states:

*Modern Surveying Instruments.*— Three types of measurements are usually involved in surveying operations —the measurement of distances, the measurement of directions, and the measurement of differences in elevation. Each of these require different kinds of instruments.

* * * Since World War II, long distances have been measured with relatively high accuracy with electronic instruments, such as the shoran, which is similar to radar in operation. * * *

It also states as to hydrographic surveying (p. 98–98a):

*Hydrographic surveying.* Hydrographic surveying is the term applied to the processes used in surveying any body of water. * * *

* * * * * *

For surveys beyond the visibility of shore signals, the positions of soundings are determined by electronic means. For distances up to 50 or 75 miles from shore, shoran, a form of radar, is used, and beyond these limits the distances up to 300 miles on an instrument called the electronic position indicator, which is a combination of shoran and loran, is used. Both these methods depend on the transmission of a radio wave (traveling at a speed of 186,218 miles per second) from the survey vessel to electronic

shore stations and involve the measurement of small time intervals of the order of one ten-millionth of a second.

See also the McGraw Hill Encyclopedia of Science and Technology, volume 13, pages 324 and 325:

Distance measurement. Traverse distances are usually measured with a tape but are also measured by stadia, subtense, trig-traverse, and electronic methods.

\* \* \* \* \* \*

*Electronic methods.* Medium-to-long-distance measurements may be speeded by use of modulated infrared light or radio microwaves. The time a signal takes to travel to a distant receiver and return to the sending instrument is measured and converted to distance. Relative accuracy improves with distance, because errors are largely constant.

In R. W. Smith v. United States, supra, and in Schlumberger Well Surveying Corp. v. United States, 54 CCPA 37, C.A.D. 901, special purpose instruments or devices having electrical features were held dutiable under paragraph 360, as surveying instruments.

The merchandise in the *Smith* case consisted of docenettes or deviation recorders which, when suspended in an oil well in an approximately vertical position and held stationary, will indicate in a photographic manner the deviation from the true vertical and also the direction of the deviation. From the record presented the court concluded that the instrument measured angles and determined direction by means of photography which method is a recognized manner of surveying known as photogrammetic surveying. It held (p. 84):

Upon the record herein, the cases cited, and definitions from the various lexicographers, we find that the docenette or deviation recorder, together with other parts involved herein, is an instrument used to measure the angle and direction of deviation from the vertical and, as such, is a surveying

instrument within the purview of paragraph 360 of the Tariff Act of 1930, as classified by the collector of customs. Being a designation by use, the provision for surveying instruments takes precedence over the *eo nomine* classifications and over the descriptive provisions in paragraphs 353 and 372 of said act, as modified, supra, invoked by plaintiff.

In Schlumberger Well Surveying Corp. v. United States, supra, the articles were described as "DCM–A Poteclinometer Cartridges" and were used with a dip meter sonde in connection with exploration leading to the production of oil. The court described their function as follows:

The record admits of no doubt that, as and when used for its intended purpose, the cartridge is combined with the dip meter sonde and the combination is suspended in an oil well drill hole. The purpose and function of the cartridge is to indicate the orientation of the dip meter sonde. The cartridge accomplishes this purpose by measuring, *in terms of angles,* the direction in which the front or reference side of the cartridge is facing relative to the north-south direction, the degree which the cartridge is titled [sic] *from the vertical,* and the direction which the front of the cartridge makes with respect to the direction which the deviation or tilt will take.

Turning now to the dip meter sonde phase of the combination, the record discloses that this instrument measures the electrical characteristics of the subsurface strata, for the purpose of determining the tilt or dip of the strata with respect to the *horizontal.* The orientation information secured through the function of the cartridge is *essential* in computing the dip or tilt of the subsurface strata. In addition, the instrument determines the orientation north-south of the strata, all in terms of angles. [Emphasis quoted.]

The court pointed out that according to documentary evidence the combination determines the dip of subsurface forma-

tions, which knowledge is important to the geologist, drilling engineer, and reservoir engineer, and that its function is geological surveying. The court referred to dictionary definitions of "survey" and "surveying" and stated:

> * * * In the light of the record before us, we are persuaded that while these definitions constitute authentic examples of the meaning of these terms, they do not impose a limitation thereupon.

It therefore held that the cartridge was classifiable as a part of a surveying instrument.

■ From these authorities it is evident that the term "surveying instruments" is not limited to the traditional or conventional ones, but that it includes instruments using modern technology and developed for special types of surveying.

In the patent issued to Dr. Wadley, it is stated:

> This invention relates to a method or system for aiding in navigation, *surveying*, or tracking by which information useful for determining the locus of a point P relative to other points A and B * * * is obtained by means of the wave transit times between the various points. (Emphasis added.)

The brochures describing the Hydrodist MRB2 refer to it as the microwave system for use in hydrographic survey. Exhibit 3 states:

> The sextant-angle method, normally used to obtain a "fix" for the moving vessel, has certain disadvantages, the major being that work normally requires to be confined to periods of daylight with good visibility. A radio method of obtaining such a "fix" would enable work of equal, or possibly greater, accuracy to be continued regardless of weather or visibility—permitting. If required, round-the-clock operations for either survey craft or dredging vessels.

Exhibit 3 also states that the Hydrodist is used in the Air Borne Control Survey System for location of

> Supplemental control points for aerial mapping
> Microwave System Towers
> Power Transmission Line Towers
> Offshore facilities for oil drilling
> Offshore pipeline routes

Although the witness indicated that there were various uses for the Hydrodist, he did not specify any except for hydrographic survey. There is nothing in the record to overcome the presumption arising from the collector's classification that these instruments were chiefly used for surveying. On the contrary, the evidence supports that finding.

Plaintiff claims, however, that the Hydrodist is an entirety consisting of a radio-telephone system and a distance-measuring system; that the radio-telephone unit if imported separately could not be classified as a surveying instrument, and that therefore the entirety cannot be so classified, citing Garrard Sales Corp. v. United States, 35 CCPA 39, C.A.D. 369.

The *Garrard* case involved automatic record changer units chiefly used in phonograph-radio combinations. When installed, the radio could not be operated while the combination was used as a phonograph and vice versa because there was but one amplifying and one loud speaker system. The court held that a radio and a phonograph were separate articles, which when combined constituted a distinct article which was something more than either, not classifiable as either a phonograph or a radio. The record changer unit was thus not dutiable as parts of phonographs. The court limited the decision to the facts presented by the record. It is clear that the radio-phonograph combination had two independent functions, neither of which supported the other. The radio was used alone for receiving broadcast sound and the phonograph was used alone to play records. The combination was thus more than a radio and more than a phonograph.

In the instant case the Hydrodist employs a radio-telephone and a distance-

measuring system, which have some elements in common. The sole purpose of the instrument is surveying. The radio-telephone is not used for any independent purpose, but only in support of the measuring aspect. The operators utilize the radio-telephone to determine how the master and remote units should be set up solely to carry out this function. While the Hydrodist is more than a radio-telephone, it is not more than or other than a surveying instrument. It employs various systems or techniques, including the radio-telephone, to carry out its only purpose, which is surveying.

Plaintiff contends, however, that the Hydrodist is radio apparatus and is more specifically provided for as such under paragraph 353, than under paragraph 360, as surveying instruments.

However, in Marconi Instruments, Ltd. v. United States, 38 Cust.Ct. 311, C.D. 1880, the court pointed out (pp. 318, 319):

> The provision in paragraph 353 relied upon by the plaintiff would appear to be very broad in its scope. It is not limited to what are commonly regarded as radio sets. On the contrary, the paragraph enumerates radio apparatus, radio instruments, and radio devices. * * *
>
> *     *     *     *     *     *
>
> The lexicographic definitions comport with our own impression that the provision for radio apparatus, instruments, and devices was used by Congress in its broader sense and, unless, otherwise indicated, would include a device such as the K–302 klystron tube when used as a generator or producer of radio waves.

In that case it was held that such Klystron tubes were classifiable as parts of radio apparatus, instruments, or devices under paragraph 353, as modified, rather than under the provision in said paragraph for articles suitable for producing, rectifying, modifying, controlling or distributing electrical energy.

This case is not authority for the proposition that the provision for radio apparatus is more specific than that for surveying instruments.

In United States v. United Geophysical Company, 38 CCPA 137, C.A.D. 451, it was held that radio equipment which did not give accurate or exact information and whose primary function was to detect objects rather than to measure distances did not have the degree of accuracy required by the articles enumerated in paragraph 368 and was properly classifiable under paragraph 353 as electrical signaling or radio apparatus.

■ The function of the merchandise in the instant case on the other hand is to measure distances through the use of microwaves. This is a surveying function, and the authorities are in agreement, that surveying may be done by electronic methods. In the Hydrodist, the radio-telephone is used in aid of the surveying function and not for any independent purpose. Therefore, the Hydrodist is more specifically provided for as surveying instruments under paragraph 360 than as radio apparatus under paragraph 353. R. W. Smith v. United States, 41 Cust.Ct. 78, C.D. 2024.

For the reasons stated, the protest is overruled and judgment will be entered for the defendant.